UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
SCHOOL FOR LANGUAGE AND
COMMUNICATION DEVELOPMENT, et al.,

                    Plaintiffs,                <u>ORDER</u>
                                               02-CV-0269(JS)(JO)

     - against -

NEW YORK STATE DEPARTMENT
OF EDUCATION, et al.,

                    Defendants.
-----------------------------------X
Appearances:
For Plaintiffs:          James M. Wicks, Esq.
                         David A. Scheffel, Esq.
                         Farrell Fritz, P.C.
                         1320 Reckson Plaza
                         Uniondale, New York 11556

For Intervenor           Robert L. Schonfeld, Esq.
Plaintiffs Lynn          Moritt Hock Hamroff & Horowitz LLP
& Michael Koufakis       400 Garden City Plaza
& Consuelo Choinski      Garden City, New York 11530

For Defendant:           Susan M. Connolly, Esq.
                         Assistant Attorney General
                         New York State Office of
                         the Attorney General
                         300 Motor Parkway, Suite 205
                         Hauppauge, New York 11788

SEYBERT, District Judge,

                         <u>INTRODUCTION</u>

        This action was commenced over four years ago by the

School for Language and Communication Development ("SLCD"), its

founder and executive director Dr. Ellenmorris Tiegerman-Farber

("Tiegerman") and five parents of disabled children who attend(ed)

SLCD.  The action was brought against the New York State Education

Department ("NYSED"); Richard P. Mills, the New York State

Commissioner of Education; Lawrence Gloeckler, the Deputy Commissioner for Vocational and Educational Services for Individuals with Disabilities; Rebecca Cort, the Statewide Coordinator of the Office of Special Education Quality Assurance; Steven Berman, the Regional Supervisor of NYSED and Vesid Special Education Quality Assurance (collectively, the "Defendants"). The Plaintiffs alleged that Defendants, _inter alia_, violated their rights guaranteed by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, _et seq._, by adopting a policy that had the effect of imposing an arbitrary "cap" on the number school-age children eligible to attend SLCD.

The Complaint has been amended twice and additional parents of SLCD students have joined the litigation; in addition, parents of two SLCD students have separately intervened. The Parties have appeared before this Court on several occasions, most recently in June of this year, when they reached an agreement to keep certain students enrolled at SLCD for the upcoming school year. Presently pending before the Court are Plaintiffs' (including the intervenor Plaintiffs) and Defendants' summary judgment motions concerning the issue at the heart of this case: whether NYSED's policy violates the IDEA. For the reasons explained below, the Court finds that NYSED's policy is not in contravention of the statute.

SLCD is a private school that is located in Glen Cove, New York. (Pls.' R. 56.1 Statement ¶ 1.) Teigerman is its founder and executive director. SLCD provides programs and services to both pre-school (pre-Kindergarten) and school-age children with severe language and communication disorders. (Pls.' 56.1 ¶ 2.) SLCD was permanently chartered by the State of New York Board of Regents in 1985. (Defs.' R. 56.1 Statement ¶ 3.[1]) SLCD's charter was most recently amended on Februaray 8, 2005 to grant SLCD provisional authority to, inter alia, educate children from ages 5-21 and operate grades 7-12. (Sheffel Reply Aff., Ex. 56.)

NYSED is a state educational agency within the meaning of the IDEA; as such, it is charged with ensuring proper compliance with the IDEA. (Pls.' ¶¶ 6, 7.) NYSED grants programmatic approval to private institutions, such as SLCD, that provide special education to children with disabilities. (Defs.' 56.1 ¶ 5; Pls.' 56.1 Counter-Statement to Defendants' R. 56.1 Statement ¶ 5.) Programmatic approval is different from a certificate of

---

[1]	Plaintiffs aptly point out that Defendants' Rule 56.1 Statement is utterly non-compliant with this Court's Individual Rules. For example, in many instances, Defendants state a factual proposition, and then generally cite to a deposition transcript that is over one-hundred-sixty pages long; in addition, Defendants cite generally to an "Exhibit D," which is not actually one document, but a collection of documents that is hundreds of pages long and is not even in chronological order. Rule 56.1 requires a party to provide pinpoint citations; this Court is not required to look for the proverbial "needle in a haystack."

authorization from the Board of Regents. It refers to NYSED's funding authorization of grades that can be taught, and the number of students that may be enrolled at a school.[2] The direct result of being an institution that lacks programmatic approval is that the NYSED will not reimburse school districts for students that are enrolled beyond your cap number, or outside your instructional level authorization. (See Defs.' 56.1 ¶ 5; Pls.' 56.1 ¶¶ 27-34.) The practical result is that school districts will not recommend your school, irrespective of its ability to take additional students on. (Id. ¶¶ 27-34.)

NYSED has authorized SLCD to serve pre-school children with disabilities who have significant developmental delays and children without disabilities. (Pl.'s 56.1 ¶ 3.) NYSED has also authorized SLCD to serve school-age children in grades Kindergarten through Third (K-3) who are severely speech and language impaired, and who may also have additional handicapping conditions. (Id. ¶ 4.) In addition, through several waivers, NYSED has authorized SLCD to continue servicing currently enrolled students up to and including 9th grade. (Id. ¶¶ 24-26; Stipulation dated 6/26/2006.) SLCD is permitted to service these students if there is no appropriate alternative recommendation made by a Committee on Special Education ("CSE"). The CSE is responsible for evaluating

---

[2]  Of course, families could pay for the school without any state funding.

children with disabilities and recommending a placement for them based upon their individual needs. (Pls.' 56.1 ¶ 8.) The CSEs develop a plan, called an Individualized Education Program ("IEP"), for each child; the IEP sets forth the specific special education program and services to be provided for a learning disabled student.

Notwithstanding the foregoing waivers (which allow SLCD relief from any cap), the current enrollment caps at SLCD are as follows: 66 full-time school-age; 24 full-time pre-school; and 81 part-time pre-school. (Pls.' 56.1 ¶ 9.)

The 1996 "Moratorium"

In July 1996, the New York State Legislature imposed a 7-year moratorium on the approval of any new or expanded programs for pre-school students with disabilities. (Pls.' 56.1 ¶.) The legislature created an exception where school districts "document a critical need for a new or expanded program in a setting which includes only preschool children with disabilities, to meet the projected demand for services for preschool children in the least restrictive environment." N.Y. Educ. Law § 44109(a)(iii). Schools seeking to rely upon the exception are required to submit such documentation to the attention of NYSED. (Pls.' 56.1 ¶ 14.)

Approximately four months later, Lawrence Gloeckler, the Deputy Commissioner for Vocational and Educational Services for Individuals with Disabilities ("Gloeckler"), issued a NYSED

"department memoranda" entitled "Procedures for Program Application and Expansion of In-State Private Schools and Center-Based Preschool Programs for Students with Disabilities." (Sheffel Aff. Ex. 5.) The memoranda provides, in relevant part:

> Applications for approval of private school programs or center-based preschool programs or applications from an approved private school or center-based preschool program seeking to expand its existing program for students with disabilities <u>will be considered only when there is a demonstrated need for the expansion of such services in that particular region of the State</u>. Private day schools or center-based preschool programs should submit a letter of intent with supporting documentation to the appropriate regional special education office of the Office of Vocational and Educational Services for Individuals with Disabilities . . . . Private residential schools should submit such letter and documentation to the Residential Placement System (RPS) Unit . . . . <u>This letter and documentation must include a description of the program the agency intends to open or expand and all required information noted below. Applications which do not address each of these factors will not be considered for approval.</u>

<u>Id.</u> (emphasis added).

The aim of the procedures is apparent, and is effectively conceded by NYSED. NYSED believes that too many children are being educated in overly restrictive environments, i.e., facilities such as SLCD that serve primarily or exclusively students with disabilities. (<u>See</u> <u>Id.</u> at 2; Defs.' Mem. of Law in Opp. to Pls.' Mot. for Partial S.J.) When explaining the type of written documentation that an applicant for expansion must obtain from the school district, Gloeckler states that the documentation should include a "projected number of students . . . whose educational

needs would be appropriately met by the program and for whom appropriate less restrictive public facilities or private schools are not available. <u>This number should include only students for whom there is documentation of efforts to place the students in less restrictive public facilities or consideration of such placements</u>. . . ." (<u>Id.</u> at 3 (emphasis added).)

In January 2000, SLCD submitted an application for expansion to NYSED. SLCD sought to expand the existing program to include grades 4-6. (Pls.' 56.1 ¶ 18.) The NYSED declined to review the application because SLCD did not submit documentation demonstrating a "local need" for expansion. (<u>Id.</u> ¶ 19.) In March 2002, SLCD submitted another application to NYSED. It is worth noting that at this point, SLCD had already commenced the instant action against the above-captioned Defendants. The March 2002 application sought authorization to expand the program to include grades 6-9. (<u>Id.</u> ¶ 20.) NYSED did not respond to the March 2002 letter. (<u>Id.</u> ¶ 21.) In May 2002, SLCD sent NYSED a letter requesting an expansion to accommodate students that had been placed on the New York City waiting list because SLCD had not been approved for expansion to serve these children (<u>Id.</u> ¶ 22.) SLCD was advised to direct the correspondence to NYSED's counsel.

<u>Impact On The Students</u>

NYSED has taken several steps to enforce the enrollment caps at SLCD. In November 2000, NYSED informed the New York City

Board of Education ("NYCBOE") and all local school districts on Long Island that it would not reimburse them for any children that they place at SLCD with an admission date from November 28, 2000 forward until SLCD reduced its enrollment to the enrollment cap level. (<u>Id.</u> ¶ 27.) In March 2001, NYSED continued to inform school districts that they would not be reimbursed for any recommendations that CSE's and CPSE's (Committees on Preschool Education) made to place new children at SLCD for the 2001-02 school year. (Pls.' 56.1 ¶ 28.) In October 2001, the NYCBOE informed CSE chairpersons that the SLCD students that had been permitted to remain at SLCD in grades 4 and 5 had to be recommended for new placements. (<u>Id.</u> ¶ 29.)

In September 2002, NYSED required school districts to secure documentation that there were no other programs in its district for a disabled child before approving a waiver to attend SLCD. (<u>Id.</u> ¶ 30.) In 2004, NYSED instructed the Central Based Support Team ("CBST") – the New York City agency that evaluates and approves IEPs – that CSE's may not recommend SLCD for children ages 4-7 for the 2004-05 school year. (<u>Id.</u> ¶ 31.) As a result of the directive, SLCD was expected to lose 43 previously enrolled children. However, as a result of waivers, they did not lose the students. (<u>Id.</u> ¶ 34.)

Over the last six years NYSED has agreed to several waivers to SLCD's enrollment cap. The waivers have allowed

children to remain at SLCD. In August 2000, NYSED granted SLCD conditional programmatic approval to extend its capacity to 72 students and to serve currently enrolled students with disabilities in grade 4 for the 2000-2001 school year. (<u>Id.</u> ¶ 24.) These were students who were "aging up" or "aging out" of SLCD's prior grade approval (K-3) from NYSED. Similar waivers were executed in: 2001, to allow service for students in grades 4-5; 2002, to allow service for students in grades 4-6; 2003, to allow service for students in grades 4-7; 2004, to allow service for students in grades 4-8;[3] 2005, to allow service for students in grades 4-8; and 2006, to allow service for students in grades 4-9.[4]

In addition, it is not disputed that NYSED allows for schools to request a variance in order to educate specific disabled children. (Pls.' 56.1 Counter-Statement ¶ 18.) According to an NYSED representative, "there are primarily two reasons to request child specific variance. One has to do with the very unique needs of a specific child and the lack of an alternative, appropriate program. The other is related to a child that the local school

---

[3] On July 12, 2004, this Court granted Plaintiffs' request for temporary injunctive relief, permitting SLCD to be considered an appropriate placement for certain "aging up" students for the 2004-05 school year. The Parties then resolved all issues, avoiding the need for any preliminary injunction hearing.

[4] The Parties appeared before this Court on June 1, 2006 concerning Plaintiffs' application for temporary injunctive relief. Similar to the July 2004 request, the issue was resolved by the Parties, resulting in the 2006 waiver.

district has determined is appropriate for retention in a specific grade." Requests for successive variances was described by the NYSED representatives as "highly unusual." (Sheffel Reply Aff. Ex. 58 at 2.)

The Lawsuit

Plaintiffs commenced this action in January 2002. They claim that the enrollment caps, November 1996 "moratorium," and actions taken by NYSED to enforce existing enrollment caps violate their rights guaranteed by the IDEA. Aside from disputing the merits of Plaintiffs' claims, Defendants argue that the Court lacks jurisdiction because Plaintiffs have not sufficiently exhausted their claims before pursuing the instant suit.

STANDARD OF REVIEW

"Summary judgment is appropriate where there is no genuine dispute concerning any material facts, and where the moving party is entitled to judgment as a matter of law." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998)(citing Fed. R. Civ. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary

judgment."" <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134 (2d Cir. 1997); <u>see also</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." <u>McLee</u>, 109 F.3d at 134.

DISCUSSION

"Congress enacted the IDEA to promote the education of children with disabilities, 'to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and . . . to ensure that the rights of children with disabilities and parents of such children are protected.'" <u>Frank G. v. Bd. of Educ. of Hyde Park</u>, 459 F.3d 356, 363 (2d Cir. 2006) (quoting 20 U.S.C. § 1400(d)(1)).  "The free appropriate public education mandated by federal law must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." <u>Walczak v. Florida Union Free School Dist.</u>, 142 F.3d 119, 122 (2d Cir. 1998) (internal quotations, citations omitted).

"Because the law expresses a strong preference for children with disabilities to be educated, 'to the maximum extent

appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." <u>Id.</u> (quoting 20 U.S.C. § 1412(5)). "Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated. <u>Id.</u> In providing a free appropriate education ("FAPE"), local school districts must establish an IEP for each child with a disability. 20 U.S.C. § 1414(b),(d).

> A state is entitled to receive federal funding pursuant to the IDEA if it has in effect policies and procedures designed to ensure, among other things that children with disabilities are identified and evaluated, that a free, appropriate public education is available to all children with disabilities, that the state is working towards providing full educational opportunity to all children with disabilities, and that children with disabilities and their parents are afforded the procedural safeguards provided under the Act.

<u>Taylor v. Vermont Dep't of Educ.</u>, 313 F.3d 768, 776 (2d Cir. 2002). The policies and procedures adhered to by New York are set forth in large part in New York Education Law § 4402, which provides for the establishment of CSEs, and the development of IEPs. <u>See</u> N.Y. Educ. Law § 4402(1)(b). Apart from the legislation set forth in New York's Education Law, NYSED possesses the authority to enact policies to ensure compliance with the IDEA, provided such policies are consistent with its objectives and guidelines.

By accepting federal funding, New York enters into a

"partnership" with federal and local governments and agencies to ensure that the goals of the IDEA are met. "The Act does not usurp the state's traditional role in setting educational policy, however. . . . It seems plain that [] Congress drew the procedural and substantive contours of education for disabled children, but left the shading and tinting of the details largely to the states. States are responsible for filling in the numerous interstices within the federal Act through their own statutes and regulations." Taylor v. Vermont Dept. of Educ., 313 F.3d 768, 777 (2d Cir. 2002) (internal quotations, citations omitted).

This case is somewhat different from the traditional case where a student's family challenges a state's specific placement determination. However, the ultimate two-prong inquiry remains the same: (1) whether the state has complied with the IDEA's procedural requirements; and (2) whether the state provides a program that is "reasonably calculated to enable the child to receive educational benefits." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)). This Circuit has instructed that the requirement that a child "receive educational benefits" does not carry with it a mandate that the state "maximize the potential of handicapped children." Walczak, 142 F.3d at 130. The IDEA requires that districts give students a "basic floor of opportunity . . . consisting of access to specialized institutions

and related services which are designed to provide educational benefit." Rowley, 458 U.S. at 201. While all parents understandably want the very best for their child, that is not always a feasible fiscal burden to impose upon the state. See Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d 710, 725-26 (S.D.N.Y. 2003).

I.  Exhaustion

Defendants argue that this Court lacks subject matter jurisdiction over the IDEA claims because Plaintiffs have not exhausted their administrative remedies. Under New York's framework of administrative review, parents of disabled students who wish to challenge a CSE's placement of their child for the upcoming school year may appeal the determination to an Impartial Hearing Officer ("IHO"). The IHO's determination may be appealed to a State Review Officer. If ultimately unsuccessful at the state level, parents may seek review in federal court. See 20 U.S.C. § 1415. The Second Circuit has recognized that, ordinarily, a plaintiff must seek administrative review before proceeding with a federal action. See Hope v. Cortines, 69 F.3d 687 (2d Cir. 1995); Garro v. State of Conn., 23 F.3d 734, 737 (2d Cir. 1994); Heldman v. Sobol, 962 F.2d 148, 158 (2d Cir. 1992) ("Normally, actions brought under IDEA must adhere to the exhaustion requirement").

There are, however, circumstances where exhaustion of administrative remedies is unnecessary. This occurs in three

situations where: "(1) it would be futile to use the due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies." <u>Mrs. W. v. Tirozzi</u>, 832 F.2d 748, 756 (2d Cir. 1987) (internal quotations, citations omitted). "The futility exception is particularly relevant in actions . . . that allege systemic violations of the procedural rights accorded by IDEA." <u>Heldman</u>, 962 F.2d at 158-59.

The Court finds that this case fits comfortably within at least two of the exceptions. To be sure, Plaintiffs are challenging a systemic violation of their procedural rights guaranteed by the IDEA. <u>See</u> <u>id.</u> They claim that NYSED's "moratorium" and caps are part of a policy that results in far-reaching interference with disabled students' ability to obtain a FAPE. In other words, they are contesting the "framework and procedures for assessing and placing students in appropriate educational programs," thus rendering exhaustion futile. <u>J.S. v. Attica Cent. Schs.</u>, 386 F.3d 107, 114 (2d Cir. 2004). Moreover, if each student brought separate complaints, "there would have been a high probability of inconsistent results." <u>Id.</u> This factor also counsels against exhaustion. Accordingly, the Court DENIES Defendants' motion to the extent it relies upon Plaintiffs' failure to exhaust remedies.

II.  The Enrollment Limitations & The Moratorium

While the Parties argue back and forth concerning the appropriate label, the results of NYSED's enrollment limits and the moratorium are not seriously disputed.  If NYSED enforced the limits (rather than execute waivers over the past several years), SLCD would not be a viable placement for students above third grade.  Plaintiffs argue that the imposition of caps runs afoul of the IDEA for several reasons.

A.  Procedural Arguments

Plaintiffs assert that the enrollment cap deprives parents of meaningful participation in their child's placement decision in violation of § 1414(d)(1)(B) of the IDEA.  See 20 U.S.C. § 1414(d)(1)(B) (describing the composition of "the Individualized education program team" as including "the parents of a child with a disability").  They contend that NYSED is violating the procedures of the IDEA "by eliminating available placement options and by directing CSEs and CPSEs not to place children at SLCD. . . . [O]nce a school like SLCD reaches its enrollment cap, it is off limits.  It does not matter what a parent says to demonstrate that SLCD is the appropriate placement for her child." (Pls.' Mem. of Law in Support of Mot. for Partial S.J. at 11.)

Plaintiffs argue that the Sixth Circuit's decision in Deal v. Hamilton County Board of Education, 392 F.3d 840 (6th Cir. 2004), is on point.  In Deal, the parents of an autistic child

challenged the school system's denial of funding for an at-home, one-on-one applied behavior analysis ("ABA") program for their child. Id. at 845-46. One of the key issues underlying the parents' appeal was whether the school system had a predetermined policy of refusing placement in any ABA program. The Deal Court found that the school system's policy violated the IDEA:

> The evidence reveals that the School System, and its representatives, had pre-decided not to offer Zachary intensive ABA services regardless of any evidence concerning Zachary's individual needs and the effectiveness of his private program. This predetermination amounted to a procedural violation of the IDEA. Because it effectively deprived Zachary's parents of meaningful participation in the IEP process, the predetermination caused substantive harm and therefore deprived Zachary of a FAPE.

Id. at 857.

If there were some evidence indicating that SLCD was the only place where the students joined in this case could obtain a FAPE, then the Court would agree that Deal might be controlling. The IDEA requires that a parent be meaningfully involved in the development of the IEP for their child; the objective of any IEP is to ensure that the child receives a FAPE. In Deal, the issue was whether the parents would be capable of obtaining a particular type of service that was arguably necessary to address their child's needs. Because the school system had an unwritten policy foreclosing any request for such schooling, the court found that the parents were deprived of meaningful participation in the development of the IEP. Plaintiffs in this case do not argue that,

absent attending SLCD, they would be unable to obtain a FAPE for their child. (Pls.' Mem. of Law at 11 ("This predetermination - the exclusion of SLCD as a placement option - is not reasonably calculated to allow a child to receive educational benefits").) Meaningful participation does not require deferral to parent choice. See Walczak, 142 F.3d at 132 ("What the statute guarantees is an 'appropriate' education, 'not one that provides everything that might be thought desirable by loving parents.'" (quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989))); Viola v. Arlington Central School Dist., 414 F. Supp. 2d 366, 384 (S.D.N.Y. 2006). Absent some showing that NYSED's enrollment caps result in parents being unable to obtain a FAPE for their child, the Court will not find that parents are being deprived of meaningful participation in the IEP development process.

Furthermore, the enrollment caps are not unyielding. NYSED will allow expansion of SLCD's maximum enrollment authorization, as well as an expansion of the authorized enrollment at any school, upon a demonstration of regional need. SLCD's position is that it need not make such a showing; all that should matter is its capacity to educate additional children. The Court disagrees. NYSED is permitted "to exercise general supervisory responsibilities to ensure proper administration of the IDEA." A.A. v. Bd. of Educ., Cen. Islip Union Free Sch. Dist., 255 F.

Supp. 2d 119, 124 (E.D.N.Y. 2003). Setting enrollment caps at schools in the furtherance of the IDEA's objectives is within the ambit of its supervisory power. <u>See</u> <u>Rowley</u>, 458 U.S. at 207 ("In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States."); <u>Taylor</u>, 313 F.3d at 776. Here, NYSED has made a policy determination consistent with the IDEA's "least restrictive environment" objectives. However, "CSEs are [still] free to create an IEP for a child that delineates the services that will provide appropriate education in the least restrictive environment. If an appropriate program exists, the child's services should be provided through it. If no appropriate program exists, and therefore the child's educational needs would go unserved as a result, then regional need may exist." Where regional need exists expansion is available under NYSED's policy. Moreover, child specific variances are available for particularized circumstances where continued education at SLCD is necessary to ensure that a child receives a FAPE.

NYSED has adopted a policy that is not inconsistent with the IDEA's objectives. Accordingly, the Court finds that NYSED's enrollment limitations do not violate the procedural requirements of the IDEA.

B.    <u>Substantive Arguments</u>

Plaintiffs proffer several reasons why NYSED's enrollment

limitations operate to deprive disabled students of a FAPE. Many of their arguments in substance mirror their procedural objections. Plaintiffs' chief complaint is that, but for the limitations, CSEs would recommend SLCD for placement of disabled students. The Plaintiff Parents insist that the absence of SLCD as an option deprives them of their rights to a FAPE. The problem with the argument, however, is that there is no showing, or even any indication, that the exclusion of SLCD de facto results in Plaintiffs not receiving a FAPE. In their Memorandum of Law in support of the instant motion, Plaintiffs do not point to any specific instance where a child has been placed, or would have been placed in a program that does not give the student a FAPE.[5]

Plaintiffs also rely upon policy letters ("Policy Letters") issued by the United States Department of Education's Office of Special Education Programs ("OSEP") as evidence that NYSED's enrollment policies substantively violate the IDEA. (Sheffel Aff., Ex. 41.) The policy letters were issued to the Rhode Island Department of Education ("RIDE") concerning an "Improvements Plan" developed by RIDE's Office of Special Needs. The Improvement Plan responded to areas of need identified by

---

[5]    Doubtless, this is the result of the many waivers that were executed between NYSED and SLCD throughout the course of this litigation. If there is an instance where a child is displaced from SLCD and the parent believes that such a displacement results in the child not receiving a FAPE, then the parents may challenge the CSE determination.

RIDE's Continuous Improvement Mentoring Process ("CIMP").  One of
the areas of potential non-compliance identified by OSEP concerned
RIDE's aim to reduce the number of disabled students receiving
special services.

RIDE's Improvement Plan proposed to reduce the
"percentage of students in each disability category . . . to be
equal or less than the national average." (Id. At 4.)  The Policy
Letter explained:

> [W]hile it is not inconsistent with [the IDEA] to include
> a numerical goal to increase the percentages of children
> with disabilities appropriately placed in less
> restrictive settings, the State must continue to monitor
> to ensure that placement decisions for all children are
> made in conformity with the least restrictive environment
> requirements of [the IDEA] and not based upon a numerical
> goal.  OSEP would not base a finding of noncompliance on
> the State's failure to meet, but rather on a failure to
> comply with the procedures specified in [the IDEA].  A
> goal of increasing the percentage of children with
> disabilities appropriately served in less restrictive
> settings can be a way for the state to measure whether it
> is improving services for children with disabilities,
> however the State must continue to monitor to ensure that
> placement decisions for all children are made in
> conformance with the [least restrictive environment]
> requirements of [the IDEA] and not based upon a numerical
> goal.  Therefore, this section of the Improvement Plan
> must be revised to describe how Rhode Island will achieve
> its goal . . . while continuing to make the full
> continuum of alternative placements (instruction in
> regular classes, special classes, special schools, home
> instruction, and instruction in hospitals and
> institutions) available and ensuring that each individual
> child is placed in a setting that meets his or her
> identified needs consistent with [the IDEA's]
> requirements.

Id.

The key point undergirding the Policy Letter was that an

individual student's FAPE should not be sacrificed in the name of a numerical goal.  However, there is no evidence of that occurring here.  Plaintiffs do not argue that NYSED has adopted a policy that caps the number of students authorized for particularized types of special education.  Nor do they set forth evidence establishing that SLCD is the only appropriate venue for addressing their specific needs.  NYSED has placed an enrollment limitation at SLCD; the enrollment capacity may be expanded upon a showing of regional need.[6]  Quite simply, there is insufficient evidence for this Court to determine that individual students' needs are not being met because of the enrollment limitation.  Accordingly, the Policy Letters provide little authority for the proposition that NYSED's policies violate the IDEA.

Furthermore, because the Court finds nothing improper with NYSED's enrollment limitations structure, the Court finds nothing impermissible about NYSED enforcing its limitations by advising CBST's that NYSED is not an acceptable placement for students above grade 3.[7]

_____

[6]    In their motion, Plaintiffs do not suggest that there is something defective about the "regional need" requirement such that it would be an inappropriate criteria to adequately provide for individual students' education needs.  Thus, the Court does not pass on that issue.

[7]    However, Plaintiffs point out that NYSED has gone further than this by directing school districts that they will not be reimbursed for any students sent to SLCD.  With respect to students appropriately placed at SLCD within the school's permissible enrollment limits, such actions are clearly

## III. <u>The Demonstration Of Regional Need</u>

Plaintiffs also maintain that they can demonstrate "regional need." (Pls.' Mem. of Law in Support of Mot. for Partial S.J. at 21.) It appears that Plaintiffs may, indeed, have a legitimate argument in this regard. NYCBOE has encouraged SLCD's request for expansion and the Nassau Board of Cooperative Education Services has recognized an increased need for special education services on Long Island. It is unclear, however, whether SLCD made any attempt to demonstrate regional need to NYSED. Plaintiffs' position on this motion is that the enrollment caps are <u>per</u> <u>se</u> violative of the IDEA, and they need not make any effort to demonstrate regional need to NYSED. They do not style this as a challenge to NYSED's proper or improper assessment of need, nor do they explain in any meaningful way why regional need is not a proper consideration in addressing the education needs of students in New York state. Accordingly, the Court is not prepared to address the issue.

CONCLUSION

The Court wholeheartedly endorses SLCD's efforts to provide services to students with special needs. Moreover, the Court empathizes with the parents of the many children who are aging out of the school. However, this Court's duty in reviewing the actions of a state agency is limited. On the record before

---

impermissible.

this Court, NYSED has not adopted a policy that is procedurally or substantively inconsistent with the IDEA. Accordingly, Plaintiffs' (including intervenor Plaintiffs) motion for partial summary judgment with respect to their IDEA claims is DENIED; Defendants' motion for summary judgment with respect to Plaintiffs' IDEA claims on the grounds of exhaustion is DENIED. Defendants' motion for summary judgment with respect to Plaintiffs' other causes of action is DENIED, without prejudice, for failure to comply with this Court's rules.[8]

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    Central Islip, New York
          September 26, 2006

---

[8]    Defendants move to dismiss the Second Amended Complaint in its entirety. However, the averments contained in its Rule 56.1 Statement are only germane to Plaintiffs' IDEA claims. "The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). Defendants have handicapped the Court by not providing a sufficient predicate for the Court to address the merits of their motion.